UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

REPORT AND RECOMMENDATION

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

James Peterson,

        Plaintiff,

   vs.

Michael J. Astrue,
Commissioner of Social
Security,

        Defendant.           Civ. No. 07-4068 (ADM/RLE)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI"). The matter is now

before the Court upon the parties' cross-Motions for Summary Judgment. The

Plaintiff appears by Philip R. Reitan, Esq., and the Defendant appears by Lonnie F.

Bryan, Assistant United States Attorney. For reasons which follow, we recommend

that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II. Procedural History

The Plaintiff first applied for DIB and SSI on February 3, 2004, at which time, he alleged that he had become disabled on July 15, 2001. [T. 30, 466-468]. The Plaintiff met the insured status requirement at the onset date of disability, and remains insured for DIB through September 30, 2008. [T. 21].

The State Agency denied his claim on initial review, and upon reconsideration. [T. 30-44, 469-478]. The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on January 24, 2006, a Hearing was conducted, at which time, the Plaintiff appeared, and was represented by counsel. [T. 21, 495-527]. Thereafter, on April 28, 2006, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 18-29]. On June 9, 2006, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 15-16], which, on August 13, 2007, denied the request for further review. [T. 9]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

- 2 -

III.  Administrative Record

A.  Factual Background.  The Plaintiff was sixty (60) years old at the time of the Hearing.  [T. 32].  He has a college degree in Art Education [T. 179], and was honorably discharged from the United States Navy in 1969, after three (3) years of service.  [T. 66].  He has past relevant work as an assembly worker, truck driver, food packer, painter, and machinist.  [T. 82].  The Plaintiff alleges that he cannot work due to his Post-Traumatic Stress Disorder ("PTSD"), depression, and degenerative disc disease.  [T. 30, 41, 47, 81].

1.  Medical Records.  In 1968, while he was serving in the military, the Plaintiff was thrown from a motorcycle, as a result of which he suffered an injury to his abdomen.  [T. 313].  An x-ray of his skull showed no abnormalities.  Id.  He was placed on bed rest, and discharged after several weeks to return to full duty.  Id.

On February 5, 1992, the Plaintiff was seen by Diane M. Dahl, M.D. ("Dr. Dahl"), for a psychiatric evaluation.  [T. 438].  He reported a history of depressive episodes, every one (1) to two (2) years, going back to his childhood.  Id.  He also reported heavy drinking, although he denied any suicidal ideation.  Id.  Dr. Dahl observed that the Plaintiff showed no signs of cognitive impairment, and the Plaintiff

- 3 -

denied any significant anxiety.   [T. 439].   She prescribed a continuation of his Desipramine.[1]   Id.

From 1993, through July of 2005, the Plaintiff regularly visited several chiropractors.   [T. 164-166, 212-216, 225-228, 376-413].   He reported regular improvement of his pain in his neck, and lower back.   Id.

On August 3, 1994, the Plaintiff was seen by Dr. Dahl for the first time in ten (10) months.   [T. 440].   The Plaintiff reported a positive mood, with no signs of lasting depression, and with improved stress management.   Id.

On December 13, 1999, the Plaintiff was seen for his depression. [T. 437]. He reported that he as functioning well at work, but he was concerned that his Desapremine was no longer as effective.   Id.   He requested Celexa[2] as an alternative. Id.

On March 15, 2000, the Plaintiff was seen in the emergency room, after he emailed his supervisor to advise that he was not coming to work, that he was going

---

[1]Desipramine is "a tricyclic antidepressant of the dibenzazepine class," which is "used * * * in the treatment of anxiety, chronic pain, attention-deficit/hyperactivity disorder, cataplexy associated with narcolepsy, and bulimia." Dorland's Illustrated Medical Dictionary, at p. 483 (29th Ed. 2000).

[2]Celexa is "indicated for the treatment of depression." Physician's Desk Reference, at p. 1162 (62nd ed. 2008).

back to bed, and that one (1) of his coworkers "might have another suicide to deal with."  [T. 442-444].  However, the Plaintiff denied any suicidal ideation, and stated that he was just having trouble with one (1) of his co-workers.  Id.  Accordingly, the Plaintiff was discharged.  Id.

On July 28, 2003, the Plaintiff was seen by Scott A. Holtz, M.D. ("Dr. Holtz"), for his depression.  [T. 224].  The Plaintiff reported that he had to switch from a generic version of Desipramine, to another manufacturer, and that, as a result, he suffered from decreased energy, and increased symptoms of depression, although he was not experiencing any suicidal ideation.  Id.  Dr. Holtz recommended weaning the Plaintiff off of Desipramine, and starting him on Zoloft.[3]  Id.

On August 25, 2003, the Plaintiff was seen by Dr. Holtz for a follow-up visit.  [T. 223].  Dr. Holtz reported that the Plaintiff's trial of Zoloft had been unsuccessful, because it caused him to sleep in excess of sixteen (16) hours per day.  Id.  Accordingly, the Plaintiff asked to restart his prescription for Desipramine, "as it has been effective for him for at least 15 years."  Id.

---

[3]Zoloft is a trademark for a preparation of sertraline hydrochloride, that is used as a treatment for "major depressive disorder."  Physicians' Desk Reference, at 2578 (62nd Ed. 2008).

In a new patient questionnaire, which is dated April of 2004, the Plaintiff advised that he injured his neck in 1962, after diving into shallow water, and in a car accident. [T. 229-230]. He also disclosed that he injured his mid-back in 1968, during his military service, while lifting heavy artillery, and in a motorcycle accident. Id. The Plaintiff further advised that he had injured his lower back in 1989, on the job, while lifting heavy objects. Id.

From May of 2004, through January of 2006, the Plaintiff regularly visited a psychologist, Jean Fortune, M.S. ("Fortune"), for therapy sessions, although less frequently in the winter, due to driving conditions. [T. 239-240, 246-68]. On May 19, 2004, Fortune completed an initial report on the Plaintiff's mental impairments. [T. 198]. With respect to the Plaintiff's PTSD, the Plaintiff advised that in January of 1969, when he was stationed on an aircraft carrier during his military service, hundreds of bombs were accidentally ignited. Id. The resultant explosions knocked the Plaintiff out of his bunk. [T. 199]. As the Plaintiff responded to the alarm, the explosions continued, and many men were killed or badly injured. Id. As the fires burned, the Plaintiff feared that he would die of suffocation. [T. 200]. The carrier was ultimately repaired, but the Plaintiff experienced feelings of horror and survivor guilt. [T. 200-201]. The Plaintiff reported that he continued to suffer intrusive

memories on a weekly basis, but that he had not suffered any nightmares in approximately four (4) years, until speaking about the experiences, during therapy sessions, had produced sleep disturbances. [T. 202-203]. The Plaintiff stated that he avoided conversations, news, and movies, relating to war. [T. 203-204].

Although he lives with his parents, and stated that he loves his parents and children, the Plaintiff informed Fortune that he felt he did not belong with his family of origin. [T. 204]. The Plaintiff also stated that he avoids people, except for his friends. Id. The Plaintiff informed Fortune that he frequently has suicidal thoughts, and that he wished he had not been born. [T. 205]. The Plaintiff also reported feelings of road rage, and that he was unable to concentrate on any task requiring detail. [T. 206]. He also reported symptoms consistent with hypervigilance, and exaggerated startle response. Id.

The Plaintiff reported that he felt no joy in his life, and that his marriage had ended because he constantly moved his family, and because he could not sustain employment. [T. 207]. He never put his degree to use, in order to find employment as a teacher. Id. Fortune opined that the Plaintiff suffered from chronic, persistent PTSD, with the full spectrum of severe and pervasive symptoms. Id. She rated his

Global Assessment of Functioning ("GAF") score as a 41.[4] [T. 209].  She concluded

that he was unable to maintain employment, to fit into social groups, or to maintain

significant relationships.  [T. 208].  Ultimately, she found that his PTSD symptoms

rendered him permanently and totally disabled.  Id.

On June 9, 2004, the Plaintiff was seen by Dr. Holtz for an evaluation of his

back pain.  [T. 218].  The Plaintiff advised that he regularly visited a chiropractor, for

the neck pain that he experienced as a result of his diving accident at the age of sixteen

(16), but that he had never sought medical care for that injury.  Id.  The Plaintiff

further advised that, after injuring his mid-back while in the military, he was evaluated

by a Navy physician, who gave him a couple of injections, sent him to bed for the day,

and then returned him to work.  Id.  The Plaintiff received no other medical care for

that injury, other than his chiropractic treatment.  Id.  The Plaintiff also informed Dr.

Holtz that he suffered PTSD, following the incident on the aircraft carrier, during his

---

[4]The GAF scale considers "psychological, social, and occupational functioning
on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical
Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On a 100 point
scale, a rating of 41-50 represents serious symptoms or any serious impairment in
social, occupational, or school functioning; a rating of 51-60 represents moderate
symptoms or moderate difficulty in social, occupational, or school functioning; and
a rating of 61-70 represents some mild symptoms, or some difficulty in social,
occupational, or school functioning, but generally functioning reasonably well and
having some meaningful interpersonal relationships.  Id.

military service. Id. In addition, the Plaintiff related that he had injured his lower back injury, while on the job in 1989, from lifting 55-gallon barrels without assistance. Id. The Plaintiff advised that he was disabled for three (3) to four (4) months by that injury, and that he continues to suffer discomfort. Id. The Plaintiff reported that chiropractic treatment had also improved those symptoms. Id.

The Plaintiff reported pain in his neck, shoulders, and lower back, on a daily basis, with occasional pain and numbness in his left arm and fingers, following activity. Id. The Plaintiff also reported pain into his left leg, but only rarely. Id. On the date of his appointment, the Plaintiff reported no radicular pain, no exercise, and no medication. Id. Following an examination, Dr. Holtz found that the Plaintiff had normal range of motion in his neck and back, with no discomfort. [T. 219]. He further found that the Plaintiff's strength was normal, and that there was no evidence of lumbar radiculopathy, or disc disease. Id. He recommended that the Plaintiff undergo an MRI, and an x-ray. Id.

Following an MRI, Dr. Holtz observed some disc protrusion and resultant nerve compression in his neck, but only mild changes in the Plaintiff's lower back. [T. 220-221, 233-234]. Dr. Holtz opined that the Plaintiff's symptoms could benefit from physical therapy, and epidural steroid treatments. Id.

On August 30, 2004, the Plaintiff underwent another MRI, which revealed a small disc bulge at the T6-7 vertebrae. [T. 232]. On September 20, 2004, the Plaintiff was seen by Dr. Holtz, for a follow-up visit. [T. 231]. The Plaintiff reported recent increased pain in his back, although his magnetic belt, and magnetic sleep pad, relieved his symptoms. Id. Dr. Holtz observed that the Plaintiff was not in marked distress, and he opined that the Plaintiff's pain was probably related to the disc bulge. Id.

On September 3, 2005, Fortune completed a psychological update, with respect to the Plaintiff's mental disabilities. [T. 239]. She observed that the Plaintiff continued to experience pervasive symptoms of PTSD. Id. In particular, the Plaintiff had advised that he did not attend a party for his parents' wedding anniversary, and further advised that he had suffered increased anxiety and upsetting dreams. Id. Fortune encouraged the Plaintiff to change his thoughts to less provoking subjects, to practice deep breathing and other relaxation techniques. Id. The Plaintiff reported that he prefers to live as a recluse, to avoid stressful people and situations. [T. 240]. The Plaintiff related that he had briefly detached himself from his adult children, because he felt anxiety from their choices and decisions. Id. Fortune observed that the Plaintiff suffered from memory impairment, difficulty with concentration,

decreased energy, and increased agitation.  Id.  Fortune rated the Plaintiff's current

GAF at a score of 45.  Id.

       2.    Evaluations.  On February 1, 2004, the Plaintiff completed a

Disability Report, in which he stated that his depression had caused him to miss a lot

of work, and that his back injuries had precluded him from performing a "normal days

[sic] work." [T. 81].  The Plaintiff stated that he had either quit or been fired from all

of his jobs, because his mental and physical disabilities, and he further stated that he

had been fired from his last job, on February 12, 2003, because his back prevented

him from fulfilling his responsibilities.  Id.  The Plaintiff reported that, in his longest-

held position, he had been employed as an assembly worker for five (5) years, until

1995, and that, in that position, he was required to lift twenty (20) pounds

occasionally, and ten (10) pounds frequently, and he was required to sit for more than

five (5) hours, to walk for one (1) hour, and to stand, stoop, and reach occasionally.

[T. 82].  In a later report, the Plaintiff stated that this was the first position which he

had maintained for more than nine (9) months.  [T. 114].

    The Plaintiff also completed a Work Activity Report, in which he advised that

he had worked since his alleged onset date, performing assembly work on a full-time

basis.  [T. 96-97].  However, the Plaintiff related that was only able to work for

- 11 -

several months, on each occasion, before his medical conditions required him to stop working.  [T. 97].

On February 12, 2004, the Plaintiff completed a Work History Report, in which he disclosed that he has worked primarily as a temporary employee, since 1990.  [T. 107, 114].  The Plaintiff reported that he had worked as an assembler, which required lifting up to fifty (50) pounds, but that he was discharged because his back prevented him from performing the job.  [T. 108].  However, the Plaintiff reported that he had also worked as an assembler, as a packager, and as a machine operator, which required him to lift only ten (10) pounds, and which required him to sit for eight (8) hours or longer.  [T. 109-113].

The Plaintiff also completed a questionnaire about his Activities of Daily Living ("ADL").  [T. 115].  The Plaintiff advised that he injured his neck at the age of sixteen (16), when he dove into shallow water; that he injured his mid-back at the age of twenty-two (22), while lifting bombs during his military service in Vietnam; and that he injured his lower back at the age of forty-three (43), while lifting heavy material on the job.  Id.  The Plaintiff reported that he had suffered from depression throughout his life.  Id.  The Plaintiff reported no change in his appearance, personal hygiene, or grooming, as a result of his impairments.  Id.  He reported that, in a typical

- 12 -

day, he watches television, uses a computer, fixes his meals, and spends twelve (12) to sixteen (16) hours sleeping.  Id.

The Plaintiff reported that he cooks, cleans, performs housework and laundry, shops, and drives himself.  [T. 116].  The Plaintiff also reported that he is able to bathe himself, play cards, play the harmonica, and perform stretching exercises for his back. [T. 118].  He further reported that he does not perform his own yardwork and snow removal, and that he lives in the basement of his parents' home.  [T. 116].  The Plaintiff also stated that he gets along well with others, that he maintains many close friendships, and that he sees his children at holidays, because they live in another town.  [T. 116-117].  The Plaintiff reported no problems with drugs or alcohol.  [T. 117].

The Plaintiff stated that his pain is constant, that he avoids any activities which require the use of his back, and that his neck pain had been exacerbated by completing paperwork, for a period of four (4) hours. [T. 116, 119].  He reported that he required assistance to lift anything over twenty-five (25) pounds.  [T. 119].  The Plaintiff also reported that he becomes irritable when he is expected to perform under pressure.  Id.

On March 18, 2004, the Plaintiff was seen by Debra A. Moran, M.A. ("Moran"), for a psychological evaluation. [T. 177]. The Plaintiff reported that he maintained a good relationship with his children and grandchildren, and that he had been living with his parents for eleven (11) months, since losing his job. Id. The Plaintiff also reported staying with his elderly parents in order to assist them. Id.

The Plaintiff reported that, in 1977, following an arrest, he was sent to treatment for alcohol abuse. [T. 179]. The Plaintiff stated that he now drinks one (1) case of beer per weekend, often staying up all night on Fridays to drink between fourteen (14) and eighteen (18) beers, until he is drunk. Id. He reported past marijuana use, although not in the previous five (5) years, and he reported that he continues to smoke cigarettes. Id. The Plaintiff advised that he has never taken prescription pain medication for his neck or back injuries. Id. Instead, he takes Excedrin, and wears magnetic belts. Id. The Plaintiff reported that he also visited a chiropractor every two (2) weeks, but not since losing his job. Id.

With respect to his depression, the Plaintiff reported crying spells from movies or reading. Id. He denied any suicide attempts, but admitted suicidal thoughts. Id. He also reported that his religious faith had gotten him through "the worst of it." [T. 179]. The Plaintiff stated that, in the past, when his depression was severe, he would

- 14 -

stay in bed for up to four (4) days, and suffer mild "mania." Id. However, the Plaintiff reported no difficulties since he began taking Desipramine in 1989. Id. The Plaintiff reported that he was diagnosed with PTSD following his military service in Vietnam, and that he continues to suffer nightmares, approximately twice per year. Id. Moran observed that the Plaintiff's medical records confirmed his diagnosis of depression, but made no mention of PTSD. Id.

The Plaintiff reported sleeping from 5:00 o'clock a.m., until 6:00 o'clock p.m., daily. Id. The Plaintiff also reported watching television, checking his email and the news, and playing solitaire. Id. The Plaintiff stated that he prepares his own meals, keeps his room clean, grooms himself, does laundry, shops for groceries, and manages his own finances. Id.

During the evaluation, Moran observed that the Plaintiff maintained eye contact, with unimpaired speech and thought, and normal interactions. [T. 180-81]. The Plaintiff was also able to complete four (4) simple mathematical problems, and Moran concluded that he had low-average intelligence. [T. 181]. Ultimately, Moran diagnosed him with major depressive disorder, and alcohol dependence, with "rule out" diagnoses for bipolar disorder, pain disorder, and PTSD. Id. She concluded that his persistence, pace, and concentration, were adequate, given that his depression was

greatly reduced through medication.  Id.  Thereafter, a State Agency physician concluded that the Plaintiff's mental impairments were not severe.  [T. 182].  The State Agency physician further concluded that the Plaintiff suffered only mild difficulties in his ADL, his social functioning, and his persistence, pace, and concentration.  [T. 192].

On March 19, 2004, the Plaintiff was seen by A. Neil Johnson, M.D., P.C. ("Dr. Johnson"), for a medical evaluation, relating to his disability claim.  [T. 167].  The Plaintiff reported constant neck pain, since the age of sixteen (16), as a result of diving into shallow water.  Id.  He also reported injuring his mid-back at the age of twenty-two (22), while in the military, and injuring his lower back at the age of forty-three (43), while at work.  Id.  The Plaintiff reported pain from his back, into his left leg, and from his neck, into his left arm.  Id.  The Plaintiff also reported some relief from the use of magnets, and he stated that he had not undergone any surgery to relieve his pain.  Id.  The Plaintiff advised that he is able to climb stairs, with a railing, to climb a ladder, to lift ten (10) to fifteen (15) pounds, to walk three (3) blocks, to stand for three (3) hours, and to sit for two (2) hours.  Id.

The Plaintiff informed Dr. Johnson that he was diagnosed with depression in 1989, but that he had suffered from it throughout his life.  Id.  He was then taking

Desipramine, with good results.  Id.  The Plaintiff reported smoking daily, and drinking beer on the weekend.  Id.  As of the date of the evaluation, the Plaintiff reported that he had been living with his parents for eleven (11) months.  Id.

Dr. Johnson observed that the Plaintiff was able to speak, hear, and walk, without difficulty.  [T. 168].  Although the Plaintiff reported pain when his neck and back moved, he was able to pick up a coin, fasten a button, and open a door without difficulty, and he was also able to get on and off the examination table without difficulty.  Id.  The Plaintiff had full use of his hands, but had mild difficulty with hopping, and moderate difficulty with squatting.  Id.  The Plaintiff had some limited range of motion in his neck and back.  [T. 168-169].  In a radiology report, Dr. Johnson found only a minimal curve in the Plaintiff's neck, and only minor narrowing of the disc space in his lumbar spine.  [T. 171].  Thereafter, a State Agency physician concluded that the Plaintiff's physical impairments were not severe.  [T. 175].

In an updated Disability Report, dated May 17, 2004, the Plaintiff stated that his pain prevents him from performing any activity for a long period of time.  [T. 143].  He also stated that he sleeps excessively, because of his PTSD and depression.  Id.  However, he reported no change in his impairments, or symptoms, since his earlier Disability Report.  [T. 139].

On September 3, 2005, Fortune completed a Psychiatric Review Technique Form, in which she concluded that the Plaintiff met the Listing requirements for PTSD. [T. 241]. She noted his symptoms of sleep disturbance, agitation, decreased energy, feelings of guilt or worthlessness, difficulty with concentration, suicidal ideation, and a pervasive loss of interest in activities. [T. 242]. She further noted his persistent anxiety, with hyperactivity, apprehensive expectations, and vigilance, and his persistent, irrational fear, with recurrent panic attacks and intrusive memories. [T. 243]. With respect to the "B" criteria, Fortune found that the Plaintiff suffered from a marked restriction in his ADL, extreme difficulties in social functioning, marked difficulties with concentration, pace, and persistence, and repeated episodes of decompensation. [T. 244]. With respect to the "C" criteria, Fortune noted that the Plaintiff had a medically documented history of an affective disorder, and she found that he was completely unable to function independently, outside of his home. [T. 245].

On February 6, 2006, Fortune completed a Mental Impairment Questionnaire, at the request of the Plaintiff's attorney. [T. 269]. She advised that she had seen the Plaintiff for monthly therapy sessions, over the course of nearly two (2) years. Id. As for treatment, Fortune reported that she worked with the Plaintiff on cognitive

restructuring, thought-stopping methods, and relaxation techniques.  Id.  She opined that his prognosis was poor, based upon his inability to tolerate stress or authority, due to his ongoing depression and agitation.  Id.  Fortune observed that the Plaintiff suffered from panic attacks and nightmares.  [T. 271].  She further reported that the Plaintiff did not trust authority figures, which caused him to become angry and quit jobs, in order to avoid personal interactions.  [T. 272].  With respect to the Plaintiff's episodes of decompensation, Fortune reported that the Plaintiff suffered those episodes when he was financially supporting his then-wife and children, but struggled to maintain employment.  [T. 275].  Because he quit his jobs, the Plaintiff suffered feelings of guilt, hopelessness, and helplessness.  Id.  Fortune stated that those episodes occurred separately, over the course of several years.  Id.

3.    Other Records.  In 2000, the Plaintiff filed a disability claim with the Department of Veterans Affairs ("VA").  [T. 338, 422-430, 445-448].  In March of 2001, the Plaintiff was awarded monthly benefits, after the VA determined that his PTSD resulted from his experience on the aircraft carrier, and that his PTSD was thirty (30) percent disabling.  [T. 334, 339].  However, the VA concluded that the Plaintiff's back condition had no connection to his military service, and it did not award any benefits for that alleged impairment.  Id.  In awarding benefits for PTSD,

the VA found evidence of "occasional decrease in work efficiency and intermittent periods of inability to perform occupational attacks," with symptoms including "depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, [and] mild memory loss * * * ." [T. 340].

During an examination dated November 17, 2000, in connection with his application for VA benefits, the Plaintiff reported that he quit his employment in March of 2000, due to a dispute with a co-worker. [T. 369]. In fact, the Plaintiff was taken to the emergency room, after he sent an email to his supervisor, in which he threatened to commit suicide if the co-worker did not stop "harassing him." [T. 370, 442-444]. However, the Plaintiff was found to be a low to moderate risk for suicide -- in fact, he claimed that "the threat was made out of spite, as the co-worker previously had lost a child due to a suicide." [T. 370, 436]. Shortly after leaving his job, in May of 2000, the Plaintiff was admitted for chemical dependency treatment at a VA hospital, for unknown reasons. [T. 370, 420]. He left after less than twenty-four (24) hours, because he disliked the facility's rules. Id.

After quitting his employment, the Plaintiff worked only as a temporary employee. [T. 369]. The Plaintiff also reported that he was happy not to be working, and that he would only work in the future as needed, as he was able to sleep as much

as he liked, and to spend the day listening to music, reading, and using the computer.
Id.

An examination was conducted by Ray M. Conroe, Ph.D., L.P. ("Dr. Conroe").
[T. 365].  Dr. Conroe found that the Plaintiff demonstrated coherent thought
processes, with adequate concentration and memory, and a moderately depressed
mood.  [T. 370].  Dr. Conroe also observed that the Plaintiff tended to blame others
for his conflicts.  Id.  The Plaintiff denied any current problems with depression or
anxiety, given his unemployment.  Id.  He also reported drinking beer continuously,
throughout the day.  Id.

In describing his military experience, including the explosions on his aircraft
carrier, Dr. Conroe found that the Plaintiff did not describe reactions which were
"particularly intrusive or distressing."  [T. 371].  In addition, the Plaintiff reported
nightmares less than once per year, since taking anti-depressant medication.  Id.  Dr.
Conroe found that the Plaintiff experienced startle responses, but no other symptoms
associated with PTSD.  [T. 372].

With respect to diagnostic testing, Dr. Conroe rated the Plaintiff at a score of
89 on the Mississippi Scale for Combat-Related PTSD, although he noted that the
Plaintiff had not experienced combat.  Id.  Although this score was below the "cut-

- 21 -

off' score of 107, Dr. Conroe did find that the Plaintiff had experienced trauma-inducing stimulus during his military service.  Id.  Dr. Conroe also administered the MMPI-2, which revealed an individual with a personality disorder, anti-social tendencies, conflict-ridden relationships, and rebellion toward authority figures.  Id.  Dr. Conroe found that one scale for PTSD was elevated, while another was not.  Id.  Lastly, Dr. Conroe gave the Plaintiff a GAF score of 55.  Id.

Ultimately, Dr. Conroe diagnosed the Plaintiff with alcohol dependence, major depressive disorder, and personality disorder NOS, with anti-social and passive-aggressive features.  Id.  He was unable to conclude, with any reasonable degree of psychological certainty, that a diagnosis of PTSD was appropriate, given that psychological testing was equivocal, in addition to the fact that the Plaintiff denied experiencing most symptoms of PTSD.  [T. 373].  With respect to the Plaintiff's behavioral difficulties and depression, Dr. Conroe found that the Plaintiff had been able to manage daily living, and to work when necessary.  Id.

B.     Hearing Testimony.  The Hearing on January 24, 2006, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record.  [T. 497].  The ALJ asked the Plaintiff's attorney if he had any objections to the evidence being introduced into the Record, or to the qualifications, and

impartiality, of the Vocational Expert ("VE"), and the Medical Expert ("ME"), and the Plaintiff's attorney stated that he did not. [T. 497-499]. In addition, the Plaintiff waived a formal reading of the issues in his case. [T. 497].

The ALJ then swore the ME to testify, and began his questions by asking about the Plaintiff's physical impairments. [T. 499]. The ME confirmed that the Plaintiff had been treated for back pain since approximately the age of twenty-three (23). Id. The ME further testified that diagnostic testing revealed mild degenerative disc disease, but no radicular neurological loss. [T. 500]. The ME stated that the Plaintiff demonstrated good range of motion in his back, with no spasms. Id. With respect to the Plaintiff's neck pain, the ME testified that an MRI revealed mild degenerative disc disease, but no neurological loss. Id. Again, the Plaintiff showed good range of motion in his neck, with no spasms, and normal upper extremity strength. Id. In addition, the ME recognized the Plaintiff's diagnoses of depression, PTSD, and alcohol dependence. Id.

The ALJ then asked the ME if any of the Plaintiff's physical impairments met or equaled the Listings, and the ME replied that they did not. Id. However, the ME advised that the Plaintiff's physical impairments would limit his ability to lift and stand, and would limit him to occasional overhead work, and occasional bending and

twisting.  [T. 501].  At that time, the ME was excused, after the Plaintiff's attorney advised that he had no questions.  Id.

The ALJ then swore the Plaintiff to testify, and began by asking the Plaintiff about his educational background.  Id.  The Plaintiff testified that he completed college with a degree in Art Education, but that he never worked as a teacher.  Id.  The Plaintiff advised that, at the time of the Hearing, he was sixty (60) years old, and that he had worked as a full-time temporary employee, for six (6) months in 2003, as an assembly worker, earning approximately $11.00 per hour.  [T. 501-502].  However, after six (6) months, he was transferred to another job, which required him to lift forty-five (45) to fifty (50) pounds.  [T. 503].  The Plaintiff stated that his employment was terminated, because he was unable to lift that amount of weight.  Id.

The Plaintiff testified that he worked as a full-time temporary employee, for six (6) months in 2002, as a packager.  Id.  Although that position required him to lift only two (2) pounds, he quit because he "couldn't mentally physically [sic] handle it any longer," due to feelings of anxiety and stress.  [T. 504].  The Plaintiff stated that he left his last full-time job, in March of 2000, in which he worked as an assembler, because he was unable to get along with two (2) of his co-workers, and one (1) supervisor.  [T. 504-505].

As of the date of the Hearing, the Plaintiff testified that he spends a typical day sleeping.  [T. 505].  He testified that he lives in his parents' basement, and that he prepares his own meals.  Id.  He advised that he receives a monthly benefits check from the VA, but that he does not receive any medical treatment through the VA .  Id. Instead, the Plaintiff stated that he has been receiving treatment from Fortune, approximately once per month, over the course of two (2) years.  [T. 506].  At the time of the Hearing, the Plaintiff was taking Desipramine, which he testified had helped with his depression.  [T. 506-507].  The Plaintiff stated that he also wears a magnet belt, to relieve his back pain, which allowed him to reduce his use of Excedrin, from eight (8) to ten (10) pills per day, to one (1) to two (2) pills per week.  [T. 507].  The Plaintiff testified that he did not take any other pain medication for his back pain.  Id.

The Plaintiff's attorney then initiated his examination of the Plaintiff by asking him how long he had been living in his parents' basement.  Id.  The Plaintiff testified that he had lived with his parents since the Spring of 2003, and that he leaves the house only once a week for groceries, and twice a month to visit the chiropractor.  Id. The Plaintiff testified that he visits his friends once per week.  [T. 508].

The Plaintiff testified that he continues to have flashbacks to his military service, and that he copes by sleeping for two (2) to three (3) days. Id. The Plaintiff stated that these flashbacks occurred every two (2) to three (3) months. Id. He reported that he sleeps all day, and is awake all night, meaning that he has very little contact with others. Id. The Plaintiff stated that he does not feel any purpose in his life, and that he is "ready to go any time the Lord wants to take me." [T. 509]. The Plaintiff also stated that he avoids people because he feels irritated during interactions with others. Id.

With respect to his work history, the Plaintiff reported that he missed work every couple of weeks when he worked as a full-time temporary employee. Id. The Plaintiff also testified that he often walked off jobs, when he "didn't like the way [he] was being treated by the people [he] was working for * * * ." Id. The Plaintiff's attorney then advised that he had no further questions. Id. In response to the ALJ's questions, the Plaintiff testified that he spends most of his time watching television, when he is not sleeping. [T. 510]. The Plaintiff reported that he drives his own car, and that he is able to make his way around a grocery store without difficulty. Id. The Plaintiff further reported that he is able to lift up to fifteen (15) pounds without difficulty. Id.

The ALJ then swore Fortune to testify. [T. 511]. Fortune attested that she had seen the Plaintiff for therapy sessions approximately thirteen (13) to fifteen (15) times, since May 19, 2004. Id. Fortune testified that, based upon the symptoms which were identified by the Plaintiff, and based upon his history of military service, she had diagnosed him with PTSD. [T. 513]. According to Fortune, the Plaintiff also reported that he had been diagnosed with PTSD while at a VA facility. Id. Fortune attested that the Plaintiff's symptoms were reduced by his prescription for Desipramine. [T. 514]. However, Fortune stated that therapy had proved difficult, given that thirty (30) years had passed since the Plaintiff's military service, without any treatment for his PTSD. Id.

Fortune reported that the Plaintiff is mistrustful of authority, and of people in general. Id. She further reported that the Plaintiff avoids conflict, and that he withdraws, even from his family, when faced with difficult situations. Id. With respect to his military experiences, Fortune stated that the Plaintiff suffers from survivor guilt, stemming from his experiences on the aircraft carrier, and that he feels tremendous guilt for loading bombs that were eventually dropped on villages in Vietnam. [T. 515]. Fortune attested that the Plaintiff has a severe tendency to isolate

himself from others, specifically citing his decision not to attend his parents' wedding anniversary, or his family reunion.  Id.

With respect to the Plaintiff's GAF score, which Fortune rated as 45, Fortune explained that he is unable to function at work, and unable to maintain social and family relationships.  [T. 516].  Fortune affirmed that she completed a Psychiatric Review Technique Form ("PRTF"), for submission to the ALJ, with respect to the Plaintiff's PTSD and depression.  Id.  Fortune testified that the Plaintiff's depression causes him to lose interest in all activities, and she cited to his sleep disturbance, agitation, decreased energy, procrastination, feelings of worthlessness, difficulty with concentration, and suicidal ideation, as further evidence of "A" criteria, relating to his depression.  [T. 517-518].  With respect to the Plaintiff's PTSD and anxiety, Fortune testified about her observations of the Plaintiff's agitation, hypervigilance, and fears, and identified those behaviors as a "nervous system response."   [T. 518-519].  Fortune also noted that the Plaintiff experiences intrusive memories, relating to his military experience.  [T. 519].

With respect to "B" criteria, Fortune opined that the Plaintiff has marked limitations in his ADL.  Id.  Although the Plaintiff is able to prepare his own meals, Fortune explained that she does not believe he is able to function outside of his

apartment.  Id.  Fortune also observed extreme difficulties with social functioning, based upon the Plaintiff's isolation, other than his visits with two (2) friends.  [T. 519-520].  Fortune testified that the Plaintiff's irritability would interfere with his ability to maintain concentration, persistence, and pace.  [T. 520].  When asked about the "C" criteria, Fortune stated that the Plaintiff was unable "to handle anything beyond taking care of himself, taking care of his medical care."  Id.

The ALJ then swore the VE to testify, and affirmed that the VE had reviewed the Record, and that he was familiar with jobs within the State of Minnesota.  [T. 525].  The VE had no questions for the Plaintiff regarding his past work history.  Id.

The ALJ then posed a hypothetical to the VE, asking him to assume a male individual, between the ages of fifty-five (55) and sixty (60), who was limited to medium work, with severe impairments of degenerative disc disease in both the cervical spine, and the lumbar spine, as well as chronic pain syndrome.  Id.  The ALJ asked the VE if that hypothetical individual could perform the Plaintiff's previous relevant work.  Id.  The VE replied that the individual could perform the Plaintiff's past relevant work, as none of that previous work had exceeded a medium exertional level.  [T. 526].

- 29 -

The ALJ then modified the hypothetical, to limit the individual to unskilled, entry-level work, which included only brief and superficial contact with the public, with co-workers, and with supervisors, and to consider an individual who also suffered from the severe impairments of PTSD, and major depressive disorder.  Id. The VE attested that the individual could perform the Plaintiff's past relevant work as a hand packager.  Id.  Although the Plaintiff's past relevant work in food service was also an unskilled, entry-level position, the VE opined that it would require more than brief and superficial contact with the public.  Id.  The ALJ then asked the VE if the individual could sustain employment, if he were likely to miss work three (3) or more days of work in a month, and the VE replied that no substantial gainful activity would be available to a person with that many absences.  [T. 527].

The Plaintiff's attorney then examined the VE, and asked him if the individual, as identified in the modified hypothetical, who suffered from PTSD and major depression, and who would decompensate from even a minimal increase in mental demands, or a change in the environment, could perform the Plaintiff's past relevant work.  Id.   The VE testified that an individual with those limitations would not be able to sustain competitive employment.  [T. 528].

The ALJ then advised that he would hold the Record open for thirty (30) days, in order to allow the Plaintiff to submit any additional medical records, from the VA, or from Fortune.  [T. 529].  The ALJ then concluded the Hearing.  Id.

C.     The ALJ's Decision.  The ALJ issued his decision on April 25, 2006. [T. 21-29].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520, and 416.920.[5]  At the

---

[5]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

first step, the ALJ acknowledged that the Plaintiff had worked as a temporary employee, on three (3) occasions, each lasting less than three (3) months, after his alleged onset date. [T. 24]. Nonetheless, the ALJ concluded that, even with that temporary employment, the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 15, 2001. Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity. Id. After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, from the ME and from Fortune, the ALJ found that the Plaintiff was severely impaired by mild degenerative disc disease, depression, PTSD with anxiety, and alcoholism. Id. The ALJ found that the Plaintiff's physical and mental impairments resulted in moderate restrictions in his ADL, and moderate difficulties with maintaining social functioning, and with maintaining concentration, pace, and persistence. [T. 25].

With respect to the Plaintiff's physical impairments, the ALJ cited the testimony of the ME, who testified that the Plaintiff does not suffer from radiculopathy, nor from any neurological, strength or sensory losses. [T. 24]. The

ME further testified that the Plaintiff's neck and back pain was caused by injuries which he sustained prior to the age of twenty-five (25), and that he was capable of a good range of motion in his spine, without spasms. Id. Furthermore, the ALJ noted that the Plaintiff's MRI scan showed only mild degenerative changes, and that the ME recommended limiting the Plaintiff to medium-exertion work.[6] Id.

As to the Plaintiff's mental impairments, the ALJ discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure. See, 20 C.F.R. §§404.1520a and 416.920(a). The four broad areas, which are relevant to the ability to work, are: activities of daily living ("ADL"); social functioning; concentration, persistence, or pace; and episodes of decompensation. Id.

After examining the medical evidence as a whole, and the testimony of the ME, the ALJ concluded that the Plaintiff was subject to a Section 12.04 affective disorder evidenced by his PTSD. [T. 24]. The Plaintiff also experienced a Section 12.06

---

[6]Although not identified by the Plaintiff, the ALJ mistakenly wrote that the ME "listen[ed] to the testimony at the hearing * * *." [T. 24.] In point of fact, the ME testified at the beginning of the Hearing, and was excused before the Plaintiff testified. See, T. 499-501. This error, however, is not material to our analysis for, as the Commissioner notes, the "Plaintiff does not challenge the ALJ's assessment of his physical impairments" and, "[a]s such, he has waived judicial review of any such argument." Defendant's Memorandum in Support, Docket No. 15, at p. 2 n. 1.

anxiety-related disorder, as evidenced by his depression, and a Section 12.09 substance addiction disorder, based upon his alcohol dependence. Id. The ALJ then addressed what limitations might result from the Plaintiff's mental impairments. Id.

With regard to the pertinent factors, the ALJ determined that, because of his mental impairments, the Plaintiff had "moderate" difficulties in the areas of concentration, persistence, pace, and social functioning; and "moderate" restrictions in his ADL. [T. 25]. The ALJ further concluded that the Plaintiff had not experienced any repeated or extended episodes of decompensation. Id. Moreover, the ALJ found that the Record did not contain any evidence that the Plaintiff's mental impairments met, or medically equaled, the "C" criteria, as set forth in Section 12.00 of the Listings. Id.

The ALJ found that little evidence supported more than moderate restrictions in the Plaintiff's daily living, and he noted that the Plaintiff was able to prepare his own meals, clean, do laundry, check email, play board games, visit friends, shop for groceries, and manage his finances. Id. The ALJ found moderate limitations in social functioning, noting the Plaintiff's abuse of alcohol, but observing that he was able to maintain relationships, and to interact appropriately during his evaluations. Id. Moreover, the ALJ concluded that, if the Plaintiff suffered from marked functional

limitations, as a result of his impairments, "one would expect more extensive treatment of the [Plaintiff's] condition such as emergency room visits, hospitalizations, psychiatric card and instability with the use of medications." Id.

In reaching his conclusion, the ALJ relied upon the evaluations of the State Agency physicians, who had found only mild restrictions in the Plaintiff's ADL, and in his ability to maintain social functioning, concentration, persistence, and pace. [T. 24]. The State Agency physicians further found that the Plaintiff had not suffered episodes of decompensation. Id. In addition, the ALJ relied upon Moran's evaluation, in which the Plaintiff described his capabilities, and in which Moran observed that the Plaintiff was oriented, with normal memory, and intact thought processes, and appropriate interactions. [T. 25]. Moran also observed that the Plaintiff's concentration, persistence, and pace were adequate, that his personal interactions were sufficient, and that he reported only limited depressive symptoms. Id. Lastly, Moran observed that the Plaintiff's mental impairments had been successfully treated for many years with Desipramine. Id.

However, the ALJ discounted Fortune's opinion, because he concluded that it was inconsistent with the Record as a whole. [T. 24]. The ALJ recounted Fortune's testimony, in which she reported that medication had alleviated the Plaintiff's

symptoms of anger and agitation.  Id.  The ALJ also noted that Fortune had rated the

Plaintiff with a GAF score of 45, but that he did not suffer from ongoing psychosis.

Id.  The ALJ acknowledged Fortune's assertion, that the Plaintiff suffered marked

functional limitations, and that he has experienced repeated episodes of

decompensation.  Id.  However, the ALJ concluded that "[t]here is a large disparity

between Jean Fortune's opinion * * * and the opinions of the State Agency Medical

Consultants and psychological evaluator Debra Moran and third party reports and

reports from the claimant."  [T. 25].  Accordingly, the ALJ declined to give any

weight to Fortune's opinion, because he concluded that it was inconsistent with the

remainder of the Record, and because he concluded that her responses were based

upon her sympathy toward the Plaintiff, rather than any objective medical findings.

Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with

the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20

C.F.R. §404.1520(d).  The ALJ determined that the Plaintiff's impairments, whether

physical or mental, did not meet, or equal, the criteria of any Listed Impairment, based

on the Record as a whole.  [T. 26].  He noted that Listing 1.04 "requires evidence of

neurological loss or strength loss."  Id.  Based upon a review of the Record, and the

opinions of the ME, and the State Agency physicians, the ALJ concluded that the Plaintiff's physical impairments did not reach that level. Id. Although Fortune had opined that the Plaintiff's mental impairments met or equaled Listings 12.04, for Affective Disorders, and 12.06, for Anxiety-Related Disorders, the ALJ discounted her opinion, and found no other evidence in the Record of the "C" criteria. [T. 24-25]. Accordingly, the ALJ concluded that the Plaintiff's mental impairments, and resultant functional limitations, did not meet, or medically equal, the degree of severity, alone, or in combination, to satisfy any of the applicable Listings during the relevant period. [T. 26].

The ALJ then proceeded to determine whether the Plaintiff retained the residual functional capacity ("RFC")  to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy. Id. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those

- 37 -

complaints were to be evaluated under the standard announced in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), <u>Social Security Ruling 96-7p</u>, and <u>Title 20 C.F.R. §404.1529</u>.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the objective medical evidence; and the Plaintiff's subjective complaints; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity for unskilled entry level medium residual functional capacity with brief and superficial contact with coworkers[,] supervisors and the public.  Medium work is defined as work lifting 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds, standing and/or walking 6 of 8 hours, and sitting 2 of 8 hours.

[T. 26].

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertions that he is unable to work.  [T. 28].

In determining the Plaintiff's RFC, the ALJ first considered the testimony of the Plaintiff, that he was unable to work due to his anxiety, stress, and physical pain. [T. 26].  The ALJ also considered the Plaintiff's testimony that he suffered flashbacks, "and sometimes goes to bed for three days," and that he quit or walked off jobs

because he could not handle the stress, or could not get along with co-workers.  Id. The ALJ noted that the Plaintiff did not attend therapy for his problems, until he began seeing Fortune, approximately two (2) years before the Hearing.  Id.  He also noted that the Plaintiff was able to drive, clean, shop, visit friends, use the computer, and play games.  Id.

The ALJ considered the Record, and found that the objective evidence did not support the Plaintiff's assertions of disability.  Id.  In arriving at that conclusion, the ALJ noted that the Plaintiff suffered only mild degenerative changes, which did not require surgery, physical therapy, or ongoing medical treatment, beyond minimal pain medications.  Id.  The ALJ concluded that the Plaintiff's ability to get along without strong pain medication was not consistent with his subjective complaints of disabling pain.  Id.

In reaching that conclusion, the ALJ gave great weight to the opinion of the ME, which he found was supported by objective medical evidence.  [T. 27].  The ME recommended limiting the Plaintiff to medium exertion levels, given his neck and back pain, although he observed that the Plaintiff had no radicular pain, and no neurological, strength or sensory losses, and that he had good range of motion in his spine.  Id.  The ALJ also noted the evaluations which were performed by the State

- 39 -

Agency physicians, Dr. Johnson and Dr. Holtz.  Id.  In particular, the ALJ noted that

Dr. Johnson reported normal range of motion in the Plaintiff's spine, with no

limitations in his extremities, and that Dr. Holtz reported that the Plaintiff was not in

distress, and that he did not report any debilitating pain.  Id.

With respect to the Plaintiff's mental impairments, the ALJ limited the Plaintiff

to unskilled, entry-level, medium-level tasks, with brief and superficial contact with

others, in order to accommodate the Plaintiff's stress and anxiety, as well as his

moderate limitations in maintaining social functioning, concentration, persistence, and

pace.  Id.  The ALJ observed that the Plaintiff's mental impairments were successfully

treated with medication, which reduced his agitation and depression, and he further

observed that the Plaintiff had not reported any adverse side effects which related to

work.  Id.

The ALJ also found that the Plaintiff's ADL were inconsistent with his

assertions of disability.  Id.  Specifically, he noted that the Plaintiff was able to play

cards, use email and his computer, maintain friendships and family relationships,

drive, shop, and clean.  Id.  The ALJ also relied upon Moran's report, in which the

Plaintiff reported excessive drinking on the weekends, which the ALJ found did not

bolster the Plaintiff's credibility.  [T. 28].  In addition, the Plaintiff reported to Moran

- 40 -

that he was able to prepare his own meals, do his laundry, clean his apartment, groom himself, and manage his own finances, all without difficulty.  Id.

The ALJ next considered the Plaintiff's work history, and concluded that he was not motivated to return to work, given his receipt of VA Payments, and his anticipation of disability benefits.  Id.  Accordingly, the ALJ found that, although the Plaintiff's impairments could have produced his alleged symptoms, he did not find the Plaintiff's assertions about the intensity, duration, and limiting effects, of his symptoms to be credible, in light of the Record as a whole.  Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC that the ALJ had determined, that the Plaintiff was capable of performing his past relevant work as a hand packager, given that it is an unskilled, entry-level, sedentary job.  Id.  The ALJ found that the Plaintiff was capable of performing the mental and physical requirements of that position, as contemplated by the RFC.  [T. 29].  Having reached that conclusion, the ALJ did not proceed to the Fifth Step of the analysis.

Accordingly, the ALJ concluded that the Plaintiff was not disabled at any time from July 15, 2001, through the date of his decision.  Id.

IV.  Discussion

A.      Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services,

16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

  B. Legal Analysis.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

1.     That the ALJ failed to afford the proper weight to the opinion of his treating physician;

2.     That the ALJ erred in finding that the Plaintiff's impairments did not meet the criteria contained in Sections 12.04, and 12.06, of the Listings;

3.     That the ALJ failed to complete and attach a Psychiatric Review Technique Form to his decision; and

4.     That the hypothetical propounded to the VE was improper.

See, Plaintiff's Memorandum, Docket No. 11.

We address each contention below.

1.     Whether the ALJ Failed to Give Substantial Weight to the Plaintiff's Treating Physician.

a.     Standard of Review. When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight.   20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  Forehand v. Barnhart, supra at 986

- 45 -

("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole.  See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.  In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.  Id.  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are

rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole."  See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4).  More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5).  When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments.  See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii).  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

b.    <u>Legal Analysis</u>.  The Plaintiff argues that the ALJ failed to accord proper weight to the opinion of Plaintiff's treating psychologist, Fortune, who opined that the Plaintiff's mental impairments rendered him unable to function at work.

As previously noted, the ALJ need not give any weight to a treating physician's conclusory statements regarding total disability.  See, <u>20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1)</u>; <u>Rogers v. Chater</u>, supra at 602.  Moreover, if justified by substantial evidence in the Record as a whole, the ALJ can discount the treating physician's opinion.  See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846. In regard to the Plaintiff's mental impairments, it is important to note that, here, the ALJ did not entirely disregard the opinion of Fortune.  Rather, he determined that Fortune's opinion as to the Plaintiff's functional limitations was inconsistent with the Record as a whole, which revealed that the Plaintiff's depression, and PTSD, was well-controlled with medication.  [T. 24-25].

The ALJ found the Plaintiff's statements to the evaluating physicians, including Moran and the State Agency physicians, to more accurately describe the mild nature of his symptoms, and he found that the evaluating physicians had more accurately assessed the Plaintiff's abilities for social functioning, concentration, persistence, and

pace.  [T. 24-25, 27-28].  The ALJ also found Fortune's opinion, and the Plaintiff's

claimed impairments, to be inconsistent with the Plaintiff's own statements to Moran,

concerning a wide variety of activities that the Plaintiff performed on a daily basis,

including cooking, cleaning, shopping, visiting friends, playing games, and managing

his finances.  [T. 25, 27-28].  We find that the ALJ thoroughly considered, and

weighed, all of the medical evidence before him, and properly discounted Fortune's

opinion, concerning the Plaintiff's state of disablement, in favor of the assessments

of the other reviewing and treating physicians, and the Record as a whole.  See,

Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.

We are mindful that a conflicting medical record confronted the ALJ, and the

conflict involved competing opinions by a treating psychologist, and of consultative

medical experts.[7]  In Cox v. Barnhart, 345 F.3d 606, 608-609 (8th Cir. 2003), our

---

[7]Although not raised by either of the parties, we note, here, that disability
determinations, by other governmental agencies, are not binding on an ALJ.  See 20
C.F.R. §404.1504.  Moreover, our Court of Appeals has held that a disability
determination, by the VA, is not binding on an ALJ when considering a Social
Security applicant's claim for DIB.  See, Pelkey v. Barnhart, 433 F.3d 575, 578 (8th
Cir. 2006), citing Fisher v. Shalala, 41 F.3d 1261, 1262 (8th Cir. 1994); DuBois v.
Barnhart, 137 Fed. Appx. 920, 921 (8th Cir. 2005); Jenkins v. Charter, 76 F.3d 231,
233 (8th Cir. 1996).  However, findings of disability by the VA, and other Federal
agencies, "even though they are not binding on an ALJ, are entitled to some weight
and must be considered in the ALJ's decision."  Morrison v. Apfel, 146 F.3d 625, 628
(8th Cir. 1998).

Court of Appeals reversed a District Court's affirmance of an ALJ's determination to deny benefits, where the determination discredited the opinions of the claimant's treating physician. There, however, the treating physician's opinions were consistent with substantial evidence in the Record as a whole, which is not the circumstance here. Where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, * * * weigh[] this evidence in accordance with the applicable standards, and attempt[] to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003).

---

In this case, the Plaintiff's examination records, which related to his application for VA benefits, was part of the Record before the ALJ. [T. 365-373]. The Plaintiff does not contend that the ALJ failed to properly consider the VA's determination, and underlying evaluation, and indeed, we find that the ALJ's ultimate conclusion, that the Plaintiff is not unable to work as a result of his PTSD, is consistent with the pertinent VA records. Compare, Brown v. Massanari, 21 Fed.Appx. 541, 542 (8th Cir. 2001)("[T]he ALJ's failure to discuss explicitly the [VA's] determination of disability is inconsequential, as the determination consists only of two pages and reports findings that are not supported in the record before the ALJ."). Accordingly, there is no basis upon which to conclude that the ALJ "implicitly rejected" the VA's determination, given that the determinations are not inconsistent. Cf., Morrison v. Apfel, supra at 628. As a result, we find no basis to conclude that the ALJ erred in his consideration of the VA records, nor have the parties presented any such basis, to reverse the ALJ, for our review.

Frankly, we are struck, as the ALJ was expressly struck, by the fact that, according to Fortune, the Plaintiff's PTSD went undiagnosed, and untreated, for "thirty years since the Vietnam War," [T. 24], and yet the level of his symptoms, and his prescribed care, were inconsistent with a totally disabling mental impairment. As reasoned by the ALJ, "if the claimant had marked and extreme functional limitations, one would expect more extensive treatment of the claimant's condition such as emergency room visits, hospitalizations, psychiatric care and instability in the use of medications." [T. 25]. This significant discrepancy between Fortune's bald conclusions, and the Record as a whole, is not explained by either Fortune, or the Plaintiff.

After close review, we are satisfied that the ALJ properly weighed the medical opinions in the Record, and afforded those opinions the weight they deserved when considered on the Record as a whole.[8] See, Bentley v. Shalala, 52 F.3d 784, 785 (8th

---

[8]In his reply memorandum, the Plaintiff asserts, without any supporting citations, that the ALJ should have considered an amended onset date, during the time that the Plaintiff was under the care of Fortune -- i.e., approximately May of 2004, through January of 2006. See, Plaintiff's Reply Memorandum, Docket No. 17, at 2. However, all of the relevant records, during that time frame, which related to Fortune's treatment of the Plaintiff, were presented to and considered by the ALJ, prior to his decision. [T. 239-275]. Because we find that the ALJ properly considered, and rejected Fortune's opinion, after considering her treatment records, we find no basis for the Plaintiff's assertion that the ALJ should have amended the

Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting <u>Cabrnoch v. Bowen</u>, 881 F.2d 561, 564 (8th Cir. 1989). As a consequence, we find no reversible error in this respect.

2.   <u>Whether the ALJ Erred in Finding that the Plaintiff's Impairments Did Not Meet the Criteria Contained in Sections 12.04, and 12.06, of the Listings</u>.

a.   <u>Standard of Review</u>.   The Commissioner's Listing of Impairments describes those impairments that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."   <u>20 C.F.R. §416.925(a)</u>.   The Listings applicable here, Sections 12.04 and 12.06, consist of a statement describing the disorders addressed by the listing -- i.e, the paragraph A criteria, which serve as a set of medical findings -- paragraph B criteria, which detail a set of impairment-related functional limitations, and additional paragraph C criteria.   See, <u>20 C.F.R. §404, Subpart P, Appendix 1, Section 12.00</u>.   The Regulations provide that a claimant has a Listed Impairment "if the diagnostic description in the introductory paragraph and

──────────────────

onset date of his own accord.   See, <u>Karlix v. Barnhart</u>, 457 F.3d 742, 747 (8th Cir. 2006)("In determining the date of onset of a disability, the ALJ should consider **the claimant's alleged date of onset**, his work history, and the medical and other evidence of his condition.")[emphasis added], citing <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1200 (8th Cir. 1997), and <u>Social Security Ruling 83-20</u> (1983).

the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied." Id. In addition, the Regulations provide that "[w]e will assess the paragraph B criteria before we apply the C criteria," and "[w]e will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied." Id.

The Section 12.04 Listings describe affective disorders, which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." Id. The "paragraph A criteria" of Section 12.04 require medically documented intermittent or continuous persistence of a variety of symptoms, including depressive syndrome, manic syndrome, or bipolar syndrome. Id. In turn, the Section 12.06 Listings encompass anxiety related disorders, in which "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms." Id. The "paragraph A criteria" of Section 12.06 require a finding of generalized persistent anxiety, a persistent irrational fear of a specific object or activity, recurrent severe panic attacks, recurrent obsessions or compulsions, or recurrent memories of a traumatic experience. Id. In order to satisfy the Listings criteria for either Sections 12.04, or 12.06, the paragraph A symptoms must result in at least two (2) of the following "paragraph B criteria":

1.      Marked restriction of activities of daily living; or

2.      Marked difficulties in maintaining social functioning; or

3.      Marked difficulties in maintaining concentration, persistence, or pace; or

4.      Repeated episodes of decompensation, each of extended duration.

Id.; see Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992)(describing procedure for evaluating mental impairments using A and B criteria); see also, Hilkemeyer v. Barnhart, supra at 446.

Alternatively, the "paragraph C criteria" for Listing 12.04, require the following showing:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.      Repeated episodes of decompensation, each of extended duration; or

2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

> 3.   Current history of 1 or more years'
>      inability to function outside a highly
>      supportive living arrangement, with an
>      indication of continued need for such
>      an arrangement.

20 C.F.R. §404, Subpart P, Appendix 1, Section 12.04.

By comparison, the "paragraph C criteria" for Listing 12.06, require a showing of a

"complete inability to function independently outside the area of one's home." 20

C.F.R. §404, Subpart P, Appendix 1, Section 12.06.

Using those standards as our guide, we proceed to analyze the Plaintiff's

arguments.

b.   Legal Analysis. As noted, the Plaintiff claims that the ALJ

erred in declining to find that his impairments met, or equaled, the Listings of Sections

12.04 or 12.06. We disagree, and find that, in arriving at his decision, the ALJ

carefully considered all of the medical evidence in the Record, and that evidence

supports his rejection of a Listings Impairment.

In his decision, the ALJ found that the Plaintiff would experience moderate

restrictions in ADL. [T. 25]. In arriving at that assessment, the ALJ considered the

Plaintiff's responses to a questionnaire, in which he stated that he was able to drive,

shop, and clean, as well as his statements to Moran, that he was able to do laundry,

- 55 -

groom himself, visit friends, play games, and manage his finances.  [T. 25, 27-28].

The ALJ additionally determined that the Plaintiff would be moderately restricted in

social functioning, after considering the Plaintiff's statements, that he visits friends

regularly, that he maintains many close friendships, and that he has had difficulty

getting along with co-workers, and the ALJ also considered Moran's observations

about her interaction with the Plaintiff.  [T. 25-27].

Finally, the ALJ found that the Plaintiff would only experience moderate

restrictions in maintaining concentration, persistence, and pace, and he based that

assessment upon the CE which was performed by Moran.  [T. 24-25].  As noted by the

ALJ, Moran found that the Plaintiff's thought processes were coherent, that his

intellectual capacity was unimpaired, that his memory was normal, and that his

concentration was adequate, and she opined that the Plaintiff was capable of carrying

out mental tasks with adequate persistence and pace, and of interacting superficially

with co-workers, supervisors, and the public.  Id.  The ALJ also found that the

Plaintiff had experienced no episodes of decompensation, and that the Record did not

reveal any evidence of the "C criteria."  Id.

The Plaintiff argues that the ALJ should have concluded that he satisfied the

"A", "B", and "C criteria," based upon Fortune's opinion.  However, we have already

determined, and explained, why the ALJ properly discounted Fortune's opinion, as inconsistent with the evidence as a whole.  See, <u>Charles v. Barnhart</u>, 375 F.3d 777, 784 (8th Cir. 2004)("conclusory and unsupported by medical findings"); <u>Hacker v. Barnhart</u>, supra at 939 ("inconsistent with substantial evidence in the record"). Ultimately, "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218-1219 (8th Cir. 2001), citing <u>Jenkins v. Chater</u>, 76 F.3d 231, 233 (8th Cir. 1996); <u>Estes v. Barnhart</u>, supra at 725; <u>Bentley v. Shalala</u>, supra at 785-87.

Here, the ALJ considered the opinion of Fortune -- that the Plaintiff would satisfy the Listings criteria for Sections 12.04 and 12.06 -- and declined to give that opinion significant weight as it appeared to be largely based upon the Plaintiff's self-reports, and not upon the objective evidence in the Record.  [T. 25].  Additionally, the ALJ noted that Fortune's opinion was contradicted by other medical opinions in the Record, including the opinion of Moran.  <u>Id.</u>

As noted, it is the ALJ's function to resolve conflicts in the medical evidence, and we find no error in the ALJ's decision to reject that portion of Fortune's opinion which was not supported by the Plaintiff's medical findings, and the Record as a whole, and to ultimately conclude that the Plaintiff's impairments did not meet or

equal the Listed Impairments in Sections 12.04 or 12.06.  The ALJ's decision was well within the "zone of choice."  See, <u>Nicola v. Astrue</u>, 480 F.3d 885, 886 (8th Cir. 2007)("We will disturb the ALJ's decision only if it falls outside the available 'zone of choice,' and "[a]n ALJ's decision is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact."), citing <u>Hacker v. Barnhart</u>, supra at 936; <u>Travis v. Astrue</u>, 477 F.3d 1037, 1042 (8th Cir. 2007)("As there is conflicting evidence on the record, the ALJ's determination that the physicians' opinions were not supported by objective evidence does not lie outside the available zone of choice.).  Accordingly, we reject the Plaintiff's contention, that the ALJ erred in concluding that his impairments did not meet, or equal, the Listings.

3.     Whether the ALJ Was Required to Complete a Psychiatric Review Technique Form.

The Plaintiff next argues that the ALJ was required to complete a Psychiatric Review Technique Form ("PRTF"), and attach it to his decision, pursuant to 20 C.F.R. §§404.1508 and 404.1520a.  See, Plaintiff's Memorandum in Support, supra at 8.  We need only briefly address the contention.

In support of his argument, the Plaintiff cites to a decision of our Court of Appeals, which held that "an administrative law judge's failure to complete a PRTF is grounds for reversal and remand."  Montgomery v. Shalala, 30 F.3d 98, 100 (8th Cir. 1994).  In reaching that determination, the Montgomery Court cited to the Social Security Regulations, which were then in effect, for the proposition that, in "all cases involving mental disorders at the administrative law judge hearing * * * level[ ], the [PRTF] **will** be appended to the decision."  Id. at 99 [emphasis in original], citing 20 C.F.R. §1520a(d)(2) (1994); see also, Pratt v. Sullivan, supra at 834 ("The regulations also require that the steps of the procedure are to be documented at each level by completion of a standard document, the 'Psychiatric Technique Review Form,'" which "must be attached to the ALJ's decision."), citing 20 C.F.R. §1520a(d)(2) (1992).

- 59 -

However, as noted by the Commissioner, Section 1520a of the Social Security Regulations was amended in 2000, and no longer requires the ALJ to complete and attach a PRTF to his decision.   The technique which applies to evaluate mental impairments is now outlined in Section 1520a, in pertinent part, as follows:

> (1)   Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s).  See §404.1508 for more information about what is needed to show a medically determinable impairment.   If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

> (2)   We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.

20 C.F.R. §404.1520a(b).

In turn, Section 1520a(e) reads as follows:

> (e)   Documenting application of the technique.  At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique.  At the administrative law judge hearing and Appeals Council levels (in cases in which the

Appeals Council issues a decision), and at the Federal reviewing official, administrative law judge, and the Decision Review Board levels in claims adjudicated under the procedures in part 405 of this chapter, **we will document application of the technique in the decision.**

\*     \*     \*

(2)     At the administrative law judge hearing and Appeals Council levels, and at the Federal reviewing official, administrative law judge, and the Decision Review Board levels in claims adjudicated under the procedures in part 405 of this chapter, **the written decision must incorporate the pertinent findings and conclusions based on the technique.** The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §1520a(e) [emphasis added].

Accordingly, the Plaintiff's assertion, that the ALJ was required to attach a completed

PTRF to his decision, is without merit, given that the amendment to the relevant

regulation became effective after our Court of Appeals issued its decisions in
Montgomery and Pratt, but before the Plaintiff's Hearing took place.  See, 65 Fed.
Reg. 50746, 50758 (August 21, 2000)(codified at 20 C.F.R. §404.1520a)("[T]hese
final rules do not require administrative law judges or the Appeals Council to
complete the [PRTF] or to attach the form to their decisions, just as we do not require
them to complete or attach RFC assessment forms to their decisions."); see also,
Collier v. Commissioner of Social Security, 108 Fed. Appx. 358, 2004 WL 1922187
at *4 (6th Cir., August 24, 2004)("While the Rules and Regulations of the Social
Security Administration once required an ALJ to append a copy of the Psychiatric
Review Technique form to his or her decision when evaluating mental impairments,
this requirement was changed in August 2000," and "[u]nder the current regulations,
an ALJ is only required to discuss the criteria identified in 20 C.F.R. §416.920a(b).");
see also, Jumping Eagle v. Barnhart, 2006 WL 858972 at *4 (D.S.D., March 27,
2006); Morlock v. Barnhart, 2005 WL 6119693 at *7 (E.D. Mo., August 17, 2005);
Fisher v. Barnhart, 2004 WL 228965 at *9 (D. Neb., February 4, 2004).

    Here, we find that the ALJ properly applied the technique, which is mandated
by Section 1520a, in assessing the Plaintiff's mental impairments.   The ALJ
considered "all relevant and available clinical signs and laboratory findings, the

effects of [the Plaintiff's] symptoms, and how [his] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment."  20 C.F.R. §404.1520a(c)(1).  He also "rate[d] the degree of [the Plaintiff's] functional limitation based on the extent to which [his] impairment(s) interferes with [his] ability to function independently, appropriately, effectively, and on a sustained basis," in the areas of "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §404.1520a(c)(2)-(3).

The ALJ found that the Plaintiff suffered from the severe mental impairments of depression, and PTSD.  [T. 24].  He further found that those impairments resulted in "moderate" limitations in ADL, social functioning, and concentration, persistence, and pace.  [T. 25, 27]; see, 20 C.F.R. §404.1520a(c)(4) ("[I]n the first three functional areas * * * we will use the following five-point scale:  None, mild, moderate, marked, and extreme[.]").  The ALJ further found that the Plaintiff had suffered no episodes of decompensation.  [T. 25]; see, 20 C.F.R. §404.1520a(c)(4) ("[I]n the fourth functional area (episodes of decompensation), we will use the following four-point scale:  None, one or two, three, four or more.").

In sum, because the ALJ was not required to attach a PRTF to his decision, and because he properly applied the technique which is mandated by Section 1520a, in reaching his decision, we find no basis for reversal in this respect.

    4.    <u>Whether the Hypothetical Propounded to the VE Was Improper</u>.

    a.    <u>Standard of Review</u>.  In determining the Plaintiff's RFC, and in framing an appropriate hypothetical for a VE, the ALJ need only include the limitations he accepted, as supported by substantial evidence.  See, <u>Pertuis v. Apfel</u>, 152 F.3d 1006, 1007 (8th Cir. 1998); <u>Rappoport v. Sullivan</u>, 942 F.2d 1320, 1323 (8th Cir. 1991).  However, when an ALJ finds that a Plaintiff suffers from impairments, the hypothetical posed to the VE must include those impairments.  See, <u>Brachtel v. Apfel</u>, 132 F.3d 417, 421 (8th Cir. 1997); <u>Newton v. Chater</u>, 92 F.3d 688, 694-95 (8th Cir. 1996)("A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant."), citing <u>Smith v. Shalala</u>, 31 F.3d 715, 717 (8th Cir. 1994); <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

The facts in the hypothetical are designed to replicate the Plaintiff's RFC, so as to allow the VE to identify jobs in the economy, if any there be, which an individual, with functional limitations like those of the Plaintiff, would be able to

perform.   See, <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1317 (8th Cir. 1991); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).   Moreover, it is well-settled that the testimony of a VE, which is based upon a properly-phrased hypothetical question, constitutes substantial evidence.   See, e.g., <u>Howard v. Massanari</u>, supra at 582; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1049 (8th Cir. 1999); <u>Porch v. Chater</u>, 115 F.3d 567, 571 (8th Cir. 1997).   In order to rely upon a VE's opinion, however, the hypothetical posed "must fully set forth a claimant's impairments." <u>Sullins v. Shalala</u>, 25 F.3d 601, 604 (8th Cir. 1994), citing <u>Totz v. Sullivan</u>, 961 F.2d 727, 730 (8th Cir. 1992).

    b. <u>Legal Analysis</u>.   The Plaintiff argues that the ALJ's hypothetical was flawed because it did not accurately describe the limitations that were imposed by the Plaintiff's impairments.   We have already determined that the ALJ thoroughly reviewed the Record, so as to ascertain that the Plaintiff's symptoms from his mental health impairments, including depression and PTSD, were insufficient to render the Plaintiff disabled, and we have also found that the ALJ did not err in declining to give substantial weight to the opinion of Fortune in finding that the Plaintiff's impairments did not satisfy the Listings criteria.   Therefore, it was appropriate for the ALJ to  only include, in his hypothetical to the VE, the limitations

that he determined to be supported by substantial evidence.  See, <u>Pertuis v. Apfel</u>, supra at 1007; <u>Rappoport v. Sullivan</u>, supra at 1323.

The hypothetical posed to the VE included the Plaintiff's age and his physical and mental work-related limitations, which were consistent with the Record; namely, unskilled, entry-level work limited to medium exertion, severe impairment by degenerative disc disease of the spine, chronic pain syndrome, major depressive disorder, and PTSD, and work limited to superficial contact with the public, co-workers, and supervisors.  [T. 525-526].  The VE testified that the hypothetical individual, who was subject to such limitations, could perform the Plaintiff's past relevant work as a hand packager.  [T. 526].

Accordingly, the ALJ's finding, that the Plaintiff was not disabled because he was capable of performing his past relevant work, was supported by substantial evidence in the Record as a whole.  See, <u>Haggard v. Apfel</u>, 175 F.3d 591, 595 (8th Cir. 1999)("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'"), quoting <u>Roberts v. Heckler</u>, 783 F.2d 110, 112 (8th Cir. 1985); <u>Andres v. Bowen</u>, 870 F.2d 453, 455 (8th Cir. 1989).  Nor is there anything, in the materials, which were submitted after the Hearing, which would warrant a different result.

Therefore, finding no error in that, or in any other aspect of the ALJ's decision, which has either been drawn to our attention, or uncovered by our independent review,[9] we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 10] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No. 14] for Summary Judgment be granted.

Dated:  July 29, 2008                              s/Raymond L. Erickson
                                                   Raymond L. Erickson
                                                   CHIEF U.S.  MAGISTRATE JUDGE

---

[9]To the extent that the Plaintiff suggests that the ALJ's decision "is not supported by substantial evidence," <u>Plaintiff's Memorandum</u>, supra at p. 13, we strongly disagree for the reasons articulated in this Report.

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **August 15, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **August 15, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.